**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

NERI TAWFIQ,

               *Plaintiff,*

               CASE NO. 1:22-cv-10245
               District Judge Paul D. Borman
               Magistrate Judge Patricia T. Morris

*v.*

CHRISTOPHER CAULEY,

               *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 6)

## I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **DENY** Defendant's Motion for Summary Judgment, (ECF No. 6), and remand the matter to the Saginaw County Circuit Court.

## II.    REPORT

### A.    Introduction

Neri Tawfiq petitioned a Michigan court to enter a personal protective order against Christopher Cauley, the director of the VA's Saginaw Medical Center, where Tawfiq formerly worked as a pharmacist. Apparently believing that Cauley instigated a false arrest at Tawfiq's home, Tawfiq asked that the court prohibit

1

Cauley from appearing at his workplace or residence, threatening to physically injure him, or possessing a firearm. Still, the PPO would have allowed Cauley to approach Tawfiq in all other settings, and it would have allowed Cauley to communicate with Tawfiq by phone or mail. But before the state court could conduct a hearing on the matter, Cauley removed the action to this Court and later moved for summary judgment, arguing that Tawfiq's requested injunction would prevent him from carrying out his official duties. Accordingly, Cauley argues that Tawfiq effectively seeks an injunction against the United States, which is barred by sovereign immunity.

### B.      Factual Background

Neri Tawfiq is a veteran and a patient at the Ann Arbor VA. (ECF No. 6-2, PageID.55, 62). Tawfiq worked as a pharmacist at the VA's Saginaw Medical Center until March 2021 when Christopher Cauley, the Director of the Medical Center, terminated Plaintiff for inappropriate "conduct" upon the recommendation of Tawfiq's supervisor. (ECF No. 6-3, PageID.72). Cauley sent Tawfiq a letter to inform him of the decision; however, the letter did not explain why Tawfiq's supervisor recommended that he be terminated, and Tawfiq went to the VA later that day to discuss his termination with his supervisor. (*Id.* at PageID.73–75; ECF No. 6-5, PageID.83). According to Cauley, Tawfiq had an "outburst" when he returned to the medical center, which included "banging on the door of the pharmacy office"

2

and demanding to speak with his "former supervisors."  (ECF No. 6, PageID.31; ECF No. 6-4, PageID.77).  Apparently, some members of the pharmacy staff felt that their "personal safety" was threatened during the incident.  (ECF No. 6-4, PageID.77).

About a week later, the Saginaw VA Medical Center's "Disruptive Behavior Committee" ("DBC") reviewed Tawfiq's outburst and determined that he "posed a risk to patient and staff safety when visiting VA medical facilities as a patient." (ECF No. 6, PageID.32 (citing ECF No. 6-4., PageID.77).  Based on that determination, the Committee placed a "Patient Record Flag" in Tawfiq's record which required Tawfiq to "check in with VA Police" whenever he arrived at a VA facility.  (ECF No. 6-4, PageID.78).  After checking in, VA police were required to "escort[]" Plaintiff to and from his appointments.  (*Id.*)

Just a day later, Tawfiq arrived at the Ann Arbor VA for a medical appointment, unaware that the Committee placed this flag.  (ECF No. 6-2, PageID.55–56).  Tawfiq alleges that while waiting for his appointment, "[four] VA police officers rushed towards" him, two of whom aimed their firearms at him.  (*Id.* at PageID.56).  Eventually, one of Tawfiq's medical "providers" intervened and escorted him to a "veteran affairs advocate."[1]  The advocate explained to Tawfiq

---

[1] Patient Advocates are VA employees who help patients "resolve [their] concerns about any aspect of [their] health care."  *Patient Advocates*, *Veterans Health*

3

that Cauley and the DBC at the Saginaw VA Medical Center placed a flag on Tawfiq's patient record.  (ECF No. 6-2, PageID.55–56).

In June, Tawfiq was at his apartment in Saginaw on a phone call with his physician.  During his call, two officers arrived at his apartment.  (*Id.* at PageID.58, 69).  Apparently, an employee of the VA had called the Saginaw Police and requested that they check on Tawfiq.  (*Id.* at PageID.67).  The caller told the dispatcher that Tawfiq had a history of "suicidal ideations" and that Tawfiq was known to carry a pistol, knife, and body armor.  (*Id.*)  The caller also mentioned that Tawfiq had previously been terminated from his position from the VA and had since made "vague threats" against the director of the VA.  (*Id.* at PageID.67–68).

The officers knocked on Tawfiq's door and Tawfiq answered, opening the door just wide enough for the officers to see his face and left arm.  (*Id.* at PageID.67).  One of the officers asked Tawfiq for his name "multiple times," but each time, Tawfiq refused to identify himself until he eventually gave a false name.  (*Id.*)  Tawfiq then attempted to shut the door on the officers, but one of the officers, who was already "in the threshold of the door," caught the door and pushed it back open.  (*Id.*)  Tawfiq then grabbed the officer by his arm and the officer pushed Tawfiq back with his other arm.  (*Id.*)  Tawfiq then "balled his left fist up" and pulled his arm

---

*Administration*,    U.S.    Department    of    Veterans    Affairs, https://www.va.gov/health/patientadvocates.asp (last updated May 11, 2015).

4

back, as though he were preparing to strike the officer.  (*Id.* at PageID.68).  But before Tawfiq could land a hit, the officer pulled his taser and instructed Tawfiq to step back.  (*Id.*)  The officers then handcuffed Tawfiq and transported him to the Saginaw County Jail.  (*Id.*)

Tawfiq appears to believe that Cauley requested this wellness check, and following this encounter with the police, Tawfiq grew fearful that Cauley would continue to harass him at his home.  (*Id.* at PageID.58–59).  For that reason, Tawfiq began living out of his car, fearing "what [Cauley would] do next."  (*Id.* at PageID.59).

Several months later, Tawfiq filed an application for a personal protective order ("PPO") against Cauley in the Saginaw County Circuit Court.  (ECF No. 6-2, PageID.51).   Section 600.2950a of the Michigan Compiled Laws provides a procedure for victims of "stalking" to obtain PPOs.  Under this statute, an individual may petition "the family division of [a Michigan] circuit court to enter a" PPO against an individual who has "stalked" the petitioner.   Mich. Comp. L. § 600.2950a(1).   Stalking, under Michigan law, is "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested."  *Id.* §§ 750.411h(d), 750.411i(d).

Where a petitioner moves for an ex parte PPO, the Court must rule on the petition within one business day, and if the Court refuses to enter an order, the petitioner may request a hearing.  Mich. Ct. R. 3.705(A)(1), (B)(1)(b).

Tawfiq's PPO application alleges that Cauley "stalked" him, as defined in the Michigan Penal Code, and Tawfiq requests that the court prohibit Cauley from (1) "appearing at [his] workplace or residence"; (2) entering onto or remaining on property owned, leased, or occupied by [him]"; (3) threatening to kill or physically injure [him]"; or (4) "purchasing or possessing a firearm."  (ECF No. 6-2, PageID.51).  The Saginaw County Circuit Court denied Tawfiq's application, and Tawfiq later moved for a hearing.  (*Id.* at PageID.50).  However, just two days prior to the scheduled hearing, Cauley removed the action to this Court pursuant to 28 U.S.C. § 1442(a)(1) (2018).  (ECF No. 1).  Cauley later moved for summary judgment, arguing that because the PPO would inhibit his official duties, the suit was effectively one against the United States, which is protected by sovereign immunity. (ECF No. 6).  Although the undersigned ordered Tawfiq to file a response brief, Tawfiq refused to do so, choosing instead to request a hearing before the Court. (ECF Nos. 7, 8, 10).  In his request, Tawfiq explained that he believed the AUSA assigned to this matter "changed [the] entire lawsuit in order to protect the Defendant." (ECF No. 10, PageID.116).  Tawfiq did not elaborate on this statement. (*Id.*)

6

### C.    Summary Judgment Standard

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant his motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such a motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict

those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D. N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*,

477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

"[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Arrington v. Cenlar Federal Savings Bank*, No. 19-10571, 2020 WL 5258466, at *2 (E.D. Mich. Sept. 2, 2020) (citing *Carver v Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)). "The movant bears the burden of showing the absence of a genuine issue as to a material fact 'regardless if an adverse party fails to respond.'" *Id.* at *2 (citing *Carver*, F.2d at 454-455). Accordingly, "[t]he Court may grant a motion for summary judgment to which the plaintiff failed to respond if it first 'examine[s] the moving party's motion for summary judgment to ensure that it has discharged its initial burden' of demonstrating 'the absence of a disputed question of material fact and a ground that would entitle the moving party to judgment as a matter of law.'" *Simpson v. Metropolitan Life Insurance Corporation*, No. 18-cv-11724, 2019 WL 1354186, at *2 (E.D. Mich. Mar. 26, 2019) (citing *Miller v. Shore Fin. Servs., Inc*., 141 F. App'x 417, 419 (6th Cir. 2005)).

    **D.**    **Analysis**

        **1.**    **Sovereign Immunity**

The United States and its agencies are immune from suit without their consent. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citing *Loeffler v. Frank*, 486 U.S. 549, 554 (1988)). This "axiomatic" principle, known as sovereign immunity, is "jurisdictional in nature" as "the terms" of the federal government's "consent to be sued" defines a court's authority to "entertain" a lawsuit against the federal government. *Id.*; *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *United States v. Sherwood*, 312 U.S. 584, 586, (1941). Here, Cauley argues that although he is named as the defendant in Tawfiq's PPO, the PPO, in effect, is a lawsuit against the federal government because it would inhibit Cauley's ability to perform his official duties as the medical director of the Saginaw VA. (ECF No. 6, PageID.36). Accordingly, Cauley argues, the Court lacks jurisdiction to grant Tawfiq's PPO. (*Id.*)

Federal employees are not, themselves, immune from suit. Officials may be held personally liable for their wrongful actions, despite being an "instrumentality of the sovereign." *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 686–87 (1949) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 580 (1943)). However, a suit that names a federal officer may, in effect, seek relief from the federal government. *Id.* at 687. And where that is so, the lawsuit is barred by sovereign immunity. *Id.*

To determine whether a suit which names an individual officer is actually a suit against the sovereign, the Court looks to the nature of the relief sought. *Id.* at 687–88.  If the judgment sought by the plaintiff would not "require action by the sovereign or disturb the sovereign's property," then the suit is against the named defendant. *Id.* at 687.  But if, on the other hand, the plaintiff seeks to enjoin the federal government or to collect funds from the treasury, then the suit is, in effect, a suit against the Federal Government. *See id.*  Accordingly, where a plaintiff names an individual officer as the defendant to recover monetary damages for the officer's "personal actions," there would rarely be any dispute that the Plaintiff seeks relief exclusively from the defendant, and that the defendant would not be protected by sovereign immunity. *Id.*

But the Supreme Court has recognized that this inquiry may become "difficult" where a plaintiff requests injunctive, rather than monetary, relief. *Id.* at 688.  Because the federal government "can act only through [its] agents," where a plaintiff requests injunctive relief to remedy some harm inflicted by a government official, such an injunction will often require some action on the part of the sovereign. *Id.* at 688–89 ("The relief sought in this case was not the payment of damages by the individual defendant . . ., it was asked that the court order the War Assets Administrator . . . not to" carry out an official action).  For that reason, the Court recognized that suits for injunctive relief against officers would not be suits

11

against the sovereign if the suit concerns actions the officer made while acting outside the scope of his or her authority. *Id.* at 689–91. For example, an officer who "purports to act as an individual," who acts beyond his or her statutory authority, or who acts in a manner that violates the constitution, does not act within the scope of his or her authority, and a suit for injunctive relief concerning such actions likely would not impact the sovereign. *Id.*

Reading these examples in a vacuum, one might infer that a suit against a federal official is actually a suit against the federal government whenever it challenges an action taken within the official's scope of authority. And this appears to be how Cauley interprets *Larson* and similar cases, positing that "a suit against a federal official acting in the scope of their employment is a suit against the sovereign . . . ." (ECF No. 6, PageID.36). However, although the *Larson* Court reasoned that a suit for injunctive relief against a federal employee, concerning actions within the scope of the official's authority, would generally constitute a suit against a sovereign, that was only because the Court recognized that an injunction to correct an employee's official conduct would generally require the court to order some other official action. *See Stafford v. Briggs*, 444 U.S. 527, 546 (1980) (Stewart, J., dissenting). But if the requested injunction would only impact the official personally, then these concerns would be obviated. *See Larson*, 337 U.S. at 704 (explaining that sovereign immunity bars injunctive relief against government

officials *only* because courts should not "restrain the Government from acting, or . . . compel it to act"). Accordingly, to determine whether a suit against an official is actually a suit against the sovereign, the focus of the inquiry is the relief sought, not the challenged action. *See Al-Nashiri v. MacDonald*, No. 11-5907 RJB, 2012 WL 1642306, at *9 (W.D. Wash. May 10, 2012); *Neely v. Blumenthal*, 458 F. Supp. 945, 953 (D.D.C. 1978). Regardless of whether the defendant acted within the scope of his or her authority, the federal government is the actual defendant only where the plaintiff seeks a remedy that burdens the sovereign. *See Sloan Shipyards v. U.S. Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567 (1922) ("An instrumentality of Government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts.").

This is consistent with how the Court has analyzed sovereign immunity in the Eleventh Amendment context. There, the Court delineates between official capacity and individual capacity suits, explaining that "an official-capacity suit is, in all respects other than name, . . . a suit against the entity," whereas a personal capacity suit "impose[s] personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Only actions against the officer in his or her official capacity are barred by sovereign immunity—a plaintiff may hold a government officer individually liable for actions taken within his or her scope of employment. *Id.*; *see Ladd v. Marchbanks*, 971 F.3d

13

574, 578 (6th Cir. 2020) (explaining that § 1983 "does not abrogate the States' sovereign immunity").  Thus, the applicability of sovereign immunity depends on the remedy, not the capacity in which the official acted.

Here, Cauley argues that because the PPO would prevent him "from entering his place of employment at the Saginaw VA, enforcing the patient flag placed on Tawfiq's record, or reporting Tawfiq's inappropriate conduct," the PPO would inhibit his official duties, and by extension, the activities of the federal government. (ECF No. 6, PageID.36).  And if this were a fair characterization of Tawfiq's requested PPO, then Cauley would have a strong point.  However, Tawfiq requests none of these actions in his PPO application.  Instead, Tawfiq requests that the Court prohibit Cauley from (1) "appearing at [Tawfiq's] workplace or residence," (2) "entering onto or remaining on property owned, leased, or occupied by" Tawfiq, (3) "threatening to kill or physically injure" Tawfiq, or (4) "purchasing or possessing a firearm."  (ECF No. 6-2, PageID.51).

This injunctive relief would affect Cauley personally, and it would not inhibit his ability to perform his official duties.  Indeed, it is difficult to see how this relief prevent Cauley from carrying out his official duties.  Surely, Cauley need not threaten Tawfiq or possess a firearm to carry out his duties, and Cauley does not explain why it would be necessary for him to personally enter Tawfiq's residence or workplace, particularly now that Tawfiq no longer works for the VA.  (ECF No. 6-

3, PageID.73).   Moreover, Tawfiq's PPO request explicitly allows Cauley to approach Tawfiq "in a public place" and to contact Tawfiq by phone or mail.  (ECF No. 6-2, PageID.51).  Thus, the PPO would not prevent Cauley from enforcing the patient flag, which only requires Tawfiq to "check in with VA police" prior to his medical appointments" so that he may be escorted, and the PPO would not prevent Cauley from "reporting Tawfiq's inappropriate conduct" if necessary.  (ECF No. 6, PageID.36; ECF No. 6-4, PageID.78).

To be sure, Tawfiq's complaint mentions the patient flag, and he appears to take issue with Cauley's efforts to enforce it.  And if Tawfiq had broadly requested injunctive relief, without specifying the relief he desired, then this might leave room for the Court to infer that Tawfiq wished to enjoin Cauley from enforcing the patient flag.  However, the Court need not wonder what relief Tawfiq wished, as Tawfiq explicitly lists his requested relief in his PPO application—none of which would affect Cauley's ability to enforce the patient flag.  Moreover, Tawfiq also provides facts which demonstrate that he was concerned with more than just the patient flag.  Indeed, Tawfiq implies that he believes Cauley asked the Saginaw Police to conduct a wellness check on him in June 2021, an encounter which escalated and ended with Police Officers arresting Tawfiq.  (*See* ECF No. 6-2, PageID.58–59, 67–68).  Following this incident, Tawfiq grew fearful that Cauley would harass him at his home, and began living out of his car.  (*Id.* at PageID.58–59).  Regardless of whether

15

these fears are well-founded, the PPO is designed to prevent Cauley from intruding into Tawfiq's home, not to prevent Cauley from conducting his official duties.[2]

Accordingly, because Tawfiq's requested PPO would not affect Cauley's ability to perform his official duties, the PPO application would not "require action by the sovereign or disturb the sovereign's property . . . ." *Larson*, 337 U.S. at 687. The PPO, therefore, is not a de facto lawsuit against the United States, and it is not barred by sovereign immunity.

### 2.   Remand

The upshot of rejecting Cauley's sovereign immunity defense, however, is that there is no longer a federal question upon which this Court can derive subject matter jurisdiction, and the Court must decide whether it should remand the matter to state court.  A federal court must remand a matter, originally removed from state court, "at any time" that the Court determines that it lacks subject matter jurisdiction. 28 U.S.C. § 1447(c) (2018).  Here, Cauley removed this matter from the Saginaw County Circuit Court pursuant to 28 U.S.C. § 1442(a)(1), which allows any officer of the United States, "or any person acting under that officer," to remove an action commenced against him or her in state court to a federal district court.  Section

---

[2] Indeed, Mich. Comp. L. § 600.2950a(1), the provision under which Tawfiq requested the injunction, only grants the court authority top prohibit conduct that constitutes "stalking"—a broader injunction would fall outside the scope of the statute.

1442(a)(1), however, does not "independently support . . . 'arising under' jurisdiction"—the defendant's removal petition must still raise a federal question for the federal court to hold jurisdiction. *Mesa v. California*, 489 U.S. 121, 136 (1989). But unlike a typical action, the federal question need not be apparent from the face of the complaint. *Id.* A court may hold jurisdiction over an action removed under § 1442(a) even if the only federal question comes from a federal defense. *Gaines v. Stenson*, No. CV-21-01774-PHX-JJT, 2022 WL 2132238, at *1 (D. Ariz. June 14, 2022) (quoting *Mesa*, 489 U.S. at 136).

And that is how Cauley proffered a basis for this Court's subject matter jurisdiction. Tawfiq's complaint does not allege a violation of federal law. He filed his petition for a PPO pursuant to Mich. Comp. L. § 600.2950a, a statute which allows Michigan courts to issue PPOs against individuals the petitioner demonstrates have "stalked" them, as defined in the Michigan Penal Code.   (ECF No. 6-2, PageID.51).  Accordingly, there is no federal issue raised in Tawfiq's complaint. The sole federal question is Cauley's sovereign immunity defense, which the Court should reject.

Still, the Court does not lose jurisdiction over the matter simply because it rejects the sole "federal defense that supported removal . . . ." *Bennett v. M.I.S. Corp.*, 607 F.3d 1076 n.13 (6th Cir. 2010) (quoting *Jamison v. Wiley*, 14 F.3d 222, 239 (6th Cir. 1994)).  The Sixth Circuit has explained that "the jurisdiction of the

federal courts over a properly removed action will not be defeated by later developments in the suit." *Jamison*, 14 F.3d at 239 (internal quotation marks omitted) (quoting 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3739 (2d ed. 1993)). In other words, a federal court can retain jurisdiction over a suit removed under § 1442(a) after there is no longer a federal question at issue, but only if the action was "properly" removed. *Id.*

To properly remove a suit under § 1442(a), a defendant must establish three elements. *Mays v. City of Flint*, 871 F.3d 437, 442–43 (6th Cir. 2017) (citing *Bennett*, 607 F.3d at 1085). First, the defendant "must establish that" he or she "acted [as] a federal officer." *Id.* at 442. Second, "those actions must have been performed under color of federal office." *Id.* at 442–43. And third, the defendant must "raise a colorable federal defense." *Id.* at 443. There is no serious dispute that Cauley is a federal officer who acted "under color of federal office"; however, I suggest that Cauley did not raise a "colorable" federal defense in his removal petition.

A "colorable" federal defense is one that is "plausible." *Bennett*, 607 F.3d at 1089. In the removal context, a defense is plausible "unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Latiolais v. Huntington Ingalls, Corp.*, 951 F.3d 286, 297 (5th Cir. 2020) (quoting *Zeringue v. Crane Co.*, 846 F.3d 785, 790 (5th Cir. 2017)). A

18

plausible defense is not just one that that would be valid if the Court were to accept all of the defendant's factual allegations as true—it includes defenses that have only an arguable basis in the law, even if the Court ultimately disagrees that the defense exists or would be available. *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391–92 (6th Cir. 2007).

For example, in *Bennett v. MIS Corp.*, a defendant removed a state-court action to federal court, arguing that it was immune from suit as a federal government contractor. 607 F.3d at 1088–89. At the time, the "government contractor defense" clearly applied to military contractors; however, the applicability of the defense to non-military contractors, like the defendant, remained an open question in the Sixth Circuit, and other Circuits were split on the issue. *Id.* at 1089–90. Although the Ninth Circuit limited the defense to military contractors, other circuits held that the defense applied to non-military contractors, reasoning that although the Supreme Court had only applied the test to military contractors, nothing in the Court's rationale suggested that the defense would not apply to all government contractors. *Id.* Without deciding which approach was correct, the Sixth Circuit reasoned that "where [a] federal defense [raises] an issue of first impression in this court and [it] ha[s] previously found success in other circuits, one would be hard pressed to say that the defense was not colorable." *Id.* at 1091 (internal quotation marks omitted). This, the Court explained, was enough to demonstrate a "colorable" defense for

purposes of evaluating removal under § 1442(a)(1). *Id.*; *see also Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999); *Cookeville*, 484 F.3d at 391–92.

Yet even under this broad understanding of the term "plausible," Cauley does not raise a colorable federal defense. Unlike in *Bennett*, where the Defendants raised, as a matter of first impression, a federal defense which was the subject of a well-developed circuit-split, Cauley's reliance on sovereign immunity, under these circumstances, has no reasonable basis in any precedent. *Cf.* 607 F.3d 1089–90. Quite the opposite, his defense contradicts the well-established principle that officers, sued in their individual capacity, are not protected by sovereign immunity, and it is premised on a mischaracterization of Tawfiq's PPO application. *See Graham*, 473 U.S. 165–66; *Larson*, 337 U.S. at 686–87. Cauley's defense, therefore, is "wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 297. Accordingly, because Cauley did not raise a colorable federal defense, he did not properly remove this action to federal court, and the Court cannot retain jurisdiction over the matter now that there is no colorable, federal defense at issue. For that reason, I suggest that the Court remand this action to the Saginaw County Circuit Court for further proceedings.

### E.    Conclusion

For the reasons discussed above, **I RECOMMEND** that Defendant's Motion for Summary Judgment, (ECF No. 6), be **DENIED**, and the case be remanded.

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each

issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 15, 2022                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge